09-1965-cr
United States v. Matthew Marino

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: May 10, 2010          Decided: August 18, 2011)

Docket No.  09-1965-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

v.

MATTHEW MARINO,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   JACOBS, Chief Judge, WINTER, and MCLAUGHLIN,

Circuit Judges.

Appeal from a final order of conviction entered by the United States District Court for the Southern District of New York (Stephen C. Robinson, Judge), following a guilty plea to one count of misprision of felony in violation of 18 U.S.C. § 4 for failing to report a Ponzi scheme.  Appellant challenges the district court's restitution order requiring appellant to pay restitution in the amount of $60 million pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A.

We affirm.

EUGENE J. RICCIO, Gulash & Riccio, Bridgeport, Connecticut, for Defendant-Appellant.

MARGERY B. FEINZIG, Assistant United States Attorney, of counsel (Preet Bharara, United States Attorney for the Southern District of New York, Jesse M. Furman, Assistant United States Attorney, of counsel), for Appellee.

WINTER, Circuit Judge:

Matthew Marino appeals from his sentencing by Judge Robinson, following a plea of guilty to misprision of felony in violation of 18 U.S.C. § 4. The only issue on appeal involves the district court's order that appellant pay restitution in the amount of $60 million. Appellant argues that the district court's order of restitution was improper because it relied on events occurring outside the relevant time period and the putative victims' losses were neither directly nor proximately caused by his actions as required by the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A.

We affirm.

                          BACKGROUND

Appellant participated in the Bayou Hedge Fund Group ("Bayou"), a classic Ponzi scheme masked as a group of domestic and offshore hedge funds that, when it unraveled in 2005,

caused approximately $200 million in investor losses.[1]

Samuel Israel III and James G. Marquez opened the original Bayou fund in 1996, with approximately $1 million in capital. Thereafter, they recruited investors to the fund, requiring a minimum investment of $100,000.  Israel and Marquez shared responsibility for the fund's investment strategy and recruiting investors.  They hired appellant's brother, Daniel Marino, a certified public accountant, to keep the fund's books and to reconcile trading records.  The fund retained accounting firm Grant Thornton to act as Bayou's independent financial auditor.

From the start, Bayou lost money.  However, rather than disclose these losses to investors, Israel and Marquez, upon Daniel Marino's suggestion, remitted a portion of the commissions they earned on trades to the fund's investors, thereby creating the illusion that the fund was earning positive returns.

By the end of 1998, the fund had accumulated substantial trading losses and masking the losses with trading commissions was no longer possible.  On or about December 30, 1998, Israel, Marquez, and Daniel Marino met to discuss the fund's losses.

---

[1]A final analysis of Bayou's records indicated that there were 392 investors who invested over $500 million in the various Bayou funds.  Of those investors, 288 lost an aggregate amount in excess of $309 million in contributions to the fund.  Of that amount, however, $110 million plus interest was recovered.

3

They devised a scheme to conceal the losses by firing Grant Thornton as independent auditor and having Daniel Marino prepare and issue sham audits.  In 1999, Daniel Marino, with the help of appellant, created a fictitious independent accounting firm, Richmond-Fairfield Associates ("RFA"), which purported to maintain offices in Manhattan.

Thereafter, Israel, Marquez, and Daniel Marino began to draft and mail to investors quarterly and monthly reports indicating fictitious positive rates of returns and inflated accumulated profits.  Investors also received annual financial statements that contained inflated rates of return on trading, overstated net asset values, and certifications from RFA that it had audited Bayou's financial reports.

In reality, however, the fund's losses continued to mount. Increasingly, Israel and Marquez blamed each other for the losses, and, in January 2001, Marquez was ousted from the fund after a dispute with Daniel Marino.  Thereafter, Daniel Marino assumed the role of Bayou's Chief Financial Officer, where he continued to manage the accounting portion of the fraud, and, through RFA, drafted the fictitious audits and certifications of the fund's financial reports.  For his part, Israel maintained responsibility for all the investment and trading activities of Bayou, including the recruitment of new investors.

4

Using the fictitious financial returns to claim a profitable track record, Israel and Daniel Marino attracted substantial numbers of new investors to the fund, receiving investment capital in excess of $500 million. Israel and Daniel Marino ultimately closed the original Bayou fund, and opened four domestic hedge funds, as well as two different sets of offshore funds in the Cayman Islands, all under the Bayou banner. They hired additional employees, including traders, accounting personnel, and administrative staff, all while continuing to provide falsified information to Bayou investors.

Appellant's involvement with Bayou began in 2002, when he was hired as an employee at a salary of $5,000 per month to develop a North Carolina office for the fund's broker-dealer. By the fall of 2002, appellant was making periodic trips to Bayou's office in Connecticut.

In or about 2003, appellant's salary increased to $10,000 per month, and he began assisting his brother Daniel Marino with private placement investments. These investments -- including movie and real estate deals, an international money transferring firm, and a French cable company -- were intended to make up for Bayou's losses and to provide personal profit to Israel and Daniel Marino. However, none of these investments were ever disclosed to Bayou investors, nor were they the type of investments that Bayou purported to be making with investors' funds. Although appellant assisted in these private

5

placement investments, he claims to have been unaware that the investments were unauthorized.

In 2003, appellant was tasked with locating new office space for RFA in mid-town Manhattan. Aside from retaining two temporary employees for a short period in the spring of 2003, RFA never had any regular employees, save for appellant. Appellant managed all of RFA's administrative tasks, including: picking up the mail at RFA's office; checking RFA's voice mail messages and reviewing written correspondence from Bayou investors; paying RFA's bills using RFA's checkbook; and picking up the phony audited financial statements from the printer and copying them after Daniel Marino signed them on behalf of RFA.

In addition, the record indicates that appellant had at least some direct interaction with Bayou investors. For example, the record includes several emails from appellant to Daniel Marino regarding phone calls and other correspondence from Bayou investors to RFA concerning RFA's audit of Bayou. In an email dated May 23, 2005, appellant notified Daniel Marino of a phone call from an investment advisor whose "client . . . invested in the Bayou Superfund and was wondering whether the audit is almost finished or not," to which appellant inquired, "Let me know if you want me to call back and provide what time frame the audit will be done." In another email, dated July 12, 2005, appellant stated: "Call from [investment

advisor to a Bayou client] had a quick question.  Asked for a call.  Wanted to check with you fir[s]t before calling back."  Another email, dated January 20, 2005, indicates that appellant was signing written correspondence on behalf of RFA with Daniel Marino's permission: "I have a certification letter from [financial advisor] Anchin, Block & Anchin re: Custom Strategy -- like last year.  Go ahead and sign it?"  The record also indicates that appellant, as early as April 10, 2003, was opening annual letters, referred to as "confirmation letters," that the fund sent to each investor indicating the value of the investor's position in the fund.  Upon receipt of the confirmation letter, the investors signed and returned the letters, thereby confirming their understanding of their account value.

In particular, the record includes two such faxes, sent by appellant to Daniel Marino on April 10 and 29, 2003, respectively (the "2003 faxes"), indicating both the dates when confirmation letters were sent to particular investors and whether the investors had subsequently confirmed the value of their investments.  Although the 2003 faxes were sent by appellant, in the "from" line of the faxes appears the pseudonym "M. Richmond," of RFA.  In addition to the 2003 faxes, the record includes an email sent by appellant in 2005 indicating that he continued to open investors' confirmation letters through 2005.

7

The record also indicates appellant's considerable involvement in concealing the fraudulent nature of RFA and Bayou. In particular, when Israel was involved in divorce litigation in early 2005, appellant played an active role in stonewalling, or otherwise preventing, Mrs. Israel's lawyers from obtaining financial records for Bayou and RFA. For example, in a January 7, 2004 memorandum to Daniel Marino, appellant discussed RFA's litigation strategy with respect to delaying its response to Mrs. Israel's subpoena for RFA's financial information. In his memorandum, appellant stated that he "would represent [RFA] and [outside counsel Kelley Drye & Warren, LLP] would assist and perhaps be co-counsel in arguing any motions/hearings," leaving open the possibility that Kelley Drye would "represent[] [RFA] themselves with my guidance." Appellant was keenly aware of the problem that Mrs. Israel's subpoena created with respect to concealing the true identity of RFA's principal and any other documentation that might reveal the fraud. As appellant's memorandum states:

> The issue . . . with me representing [RFA] is that the opposing attorney would pick up on my relation to you [Daniel Marino] and therefore seek an aggressive stance of distrust.
>
> The issue with [Kelley Drye] representing [RFA] is that they need to speak to the [RFA] principal and review what documents they have.

His memorandum also states: "[Kelley Drye] suggested that . . . as a second prong to the motion [to quash], [RFA] asks for a

8

protective order on any documents provided to keep them confidential (this obviously doesn't help us)."

Later, on January 10, 2005, appellant sent an email to Daniel Marino again discussing ways to stonewall Mrs. Israel's attorney: "Another short term solution is to have Mr. R call the opposing attorney and ask for a month on the pretext that he was away in latter December and was sick during first week in December and just got the subpoena." The record indicates that appellant frequently used the pseudonym "M. Richmond" as the fictitious principal of RFA.[2]

On February 13, 2005, in an email to Daniel Marino regarding RFA's then-outside counsel Leonard Benowich's response to Mrs. Israel's subpoena, appellant again discussed the problem of revealing RFA's principal:

> In regards to [RFA], Benowich has prepared Affidavits from himself, you and an individual at [RFA] . . . . The Affidavit from [RFA] needs to come from an individual and needs to be made as it discusses more particularly the arguments [RFA] has in quashing the motion. This is something [i.e., the identity of the RFA principal] we will need to figure out who.

Appellant's involvement in hiding information from Mrs. Israel's attorney is also evident in an email to Daniel Marino on July 14, 2005, regarding a draft letter from Benowich to Mrs. Israel's attorney. Benowich's draft letter attached to the email

---

[2] The district court treated appellant as the alter-ego of Matt Richmond: "[T]he documents were there in front of [appellant] to see . . . as Mr. Richm[ond] of [RFA]."

9

stated: "Please be advised that as far as . . . Dan Marino and Sam Israel are concerned, you will not receive any documents nor will you be deposing anyone associated with my client [RFA]." In the email, appellant also stated in reference to the draft letter:  "It may be better to say 'as far as my client is concerned' rather than Dan Marino and Sam Israel because there is supposed to be independence between [RFA] and the both of you."

Meanwhile, as appellant and Daniel Marino continued in their efforts to stonewall Mrs. Israel's attorney, Bayou had begun to unravel in a serious manner.  By 2005, Israel and Daniel Marino had largely wound down and suspended trading on behalf of the various Bayou funds, while still representing to their clients that Bayou was actively managing an investment portfolio.  Rather than pursuing legitimate trading activities, they instead invested the remaining Bayou funds in a series of fraudulent "prime bank" instrument trading programs in a desperate attempt to recoup Bayou's enormous losses.

For his part, appellant continued to play a substantial role in concealing Bayou's losses from its investors.  For example, in March 2005, prior to mailing RFA's 2004 "audit" of Bayou to investors, appellant, at Daniel Marino's direction, changed a number in the "audited" financials that were later distributed to investors.

On May 23, 2005, after Israel transferred nearly $100 million to a New Jersey bank in pursuit of a prime bank

10

investment opportunity, the Arizona Attorney General seized the funds after concluding that the funds were the proceeds of a fraudulent prime bank scheme.  Thereafter, investors began to inquire in earnest about Bayou's activities, and, in mid-July 2005, one such investor requested documentation as to RFA's independence from Daniel Marino.

To allay the investor's concerns, and, as appellant stated in an email to Daniel Marino, "until snooping is done on [RFA] itself," appellant and Daniel Marino devised a scheme to provide the investor a fake purchase-sale agreement indicating that RFA had been sold by Daniel Marino to the fictitious Matt Richmond on September 31, 1999.  However, the agreement was never provided to the investor.

The Bayou fraud was finally revealed in August 2005, when Daniel Marino issued a check for approximately $53 million to an investor who was asking questions about the fund and seeking to redeem his investment.  After the check was returned for insufficient funds, on August 16, 2005, the investor attempted to meet Daniel Marino at Bayou's office in Stamford, Connecticut. There, the investor discovered a suicide/confession note from Daniel Marino which fully revealed the Bayou fraud.  The investor notified the local police, who later located Daniel Marino and notified federal authorities.

Israel, Daniel Marino, and Marquez later pled guilty to charges related to the Bayou fraud.  Israel and Daniel Marino

were sentenced principally to 20 years' imprisonment and ordered to pay $300 million in restitution. Marquez was sentenced principally to 51 months' imprisonment and ordered to pay restitution in the amount of $6,259,650.

On September 3, 2008, appellant pled guilty to misprision of felony pursuant to a <u>Pimentel</u> letter.[3] Appellant admitted that, from January 2005 through August 2005, he was aware of the fraud being perpetrated on Bayou's investors, and failed to report the crime. In addition, appellant admitted to having taken affirmative action to conceal the fraud, including participating in the administration of RFA, concealing RFA's financial information from Mrs. Israel, modifying the number in the financial statements, and assisting Daniel Marino in creating the fake purchase-sale agreement for RFA.

On April 21, 2009, the district court sentenced appellant to 21 months' imprisonment, to be followed by a term of supervised release of one year, a mandatory $100 assessment, and restitution in the amount of $60 million. The court explained that the amount of restitution was appropriate because appellant's role was "significant and key to the perpetuation of the fraud." In

---

[3] A <u>Pimentel</u> letter generally refers to an informational letter from the government containing an estimate of a defendant's likely sentence under the Sentencing Guidelines. <u>See</u> <u>United States v. Pimentel</u>, 932 F.2d 1029, 1034 (2d Cir. 1991). It is not a binding contract nor a plea agreement, but it is often relied upon by defendants in entering guilty pleas.

12

particular, the court explained that, by maintaining the appearance that RFA was a legitimate accounting firm, appellant led investors to believe that "their investments [were being] scrubbed and reviewed" and that the Bayou Fund was "legitimate and real," thereby "allow[ing] the fraud to perpetuate." The court determined that restitution in the amount of $60 million -- the estimated amount of losses suffered by Bayou Fund investors between January and August 2005 -- was appropriate restitution given the fact that these losses were reasonably foreseeable to appellant.

This appeal followed.

DISCUSSION

"We review a district court's order of restitution for abuse of discretion." United States v. Ojeikere, 545 F.3d 220, 222 (2d Cir. 2008) (internal quotation marks omitted). We review the district court's legal conclusions de novo, and its factual findings for clear error. United States v. Amato, 540 F.3d 153, 158 (2d Cir. 2008).

a) Reliance on Pre-2005 Events

Appellant first argues that the district court erred by relying upon events that transpired outside the relevant time period. In particular, appellant asserts that his fraudulent faxes in 2003 while he was working at RFA fall outside the relevant period of the offense for which he was convicted -- i.e., January through August 2005 -- and the district court

13

should therefore not have relied upon them in determining the restitution amount.  We disagree.

Because appellant did not raise this argument as an objection at sentencing, we review it only for plain error.  See United States v. Inserra, 34 F.3d 83, 90 n.1 (2d Cir. 1994).  The district court considered appellant's 2003 faxes only to show knowledge of the consequences of his acts during the period of his criminal activity.  The 2003 faxes established that appellant had knowledge of the severity of potential investor losses at stake in the Bayou fraud during the relevant time period in 2005.  As the court explained at sentencing, "[the investors' losses were] also foreseeable to him because he's the person that is sending out confirmations with dollar figures . . . and waiting to see if people confirmed that they received these confirmations on their investment."  Accordingly, we find no error, much less plain error, in the district court's use of the 2003 faxes at sentencing.

b) Direct and Proximate Causation

Appellant's second argument is that restitution is improper because the victims' losses were neither directly nor proximately caused by his actions or inactions as required under the MVRA. We disagree.

1.  The Statutory Framework

The MVRA requires sentencing courts to order restitution for certain crimes, such as "an offense against property under this

14

title . . . including any offense committed by fraud or deceit,"
and where an identifiable victim has suffered pecuniary loss.  18
U.S.C. § 3663A(a)(1); § 3663A(c)(1).[4]  "The goal of restitution,
in the criminal context, is 'to restore a victim, to the extent
money can do so, to the position he occupied before sustaining
injury.'" United States v. Battista, 575 F.3d 226, 229 (2d Cir.
2009) (quoting United States v. Boccagna, 450 F.3d 107, 115 (2d
Cir. 2006)).

The statute defines "victim" broadly as any:

person directly and proximately harmed as a result of

---

[4]Section 3663 addresses restitution generally, and provides
that when sentencing a defendant, the court may order
restitution.  18 U.S.C. § 3663(a)(1)(A) ("The court, when
sentencing a defendant convicted of an offense under this title .
. . other than an offense described in section 3663A(c), may
order . . . that the defendant make restitution to any victim of
such offense . . . .").  Section 3663A mandates restitution for
specified offenses, and provides, in relevant part:

(a)(1)  Notwithstanding any other provision of law,
when sentencing a defendant convicted of a [covered]
offense . . . , the court shall order . . . that the
defendant make restitution to the victim of the offense
or, if the victim is deceased, to the victim's estate.

. . .

(c)(1) This section shall apply in all sentencing
proceedings for convictions of, or plea agreements
relating to charges for, any offense . . . (A) that is
. . . (ii) an offense against property under this
title, . . . including any offense committed by fraud
or deceit . . .

Id. § 3663A.

15

the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

In addition, the MVRA provides that restitution may not be imposed if the determination of complex issues of fact relating to causation would unduly "complicate or prolong the sentencing process." Id. § 3663A(c)(3)(B). As we have noted, this latter provision reflects Congress's intent that "sentencing courts not become embroiled in intricate issues of proof," and that the "process of determining an appropriate order of restitution be streamlined." United States v. Reifler, 446 F.3d 65, 136 (2d Cir. 2006) (citations and internal quotation marks omitted).

The procedures by which the sentencing court imposes a restitution order are set forth in 18 U.S.C. § 3664. Pursuant to Section 3664, after a defendant pleads or is found guilty of a covered crime, a federal probation officer provides the sentencing court with a report that includes, inter alia, details of the victims of the defendant's crime and their losses, as well as the economic circumstances of the defendant. 18 U.S.C. § 3664(a). Upon review of this report, and after a sentencing hearing, the sentencing court determines the amount of restitution the defendant owes, resolving any disputes as to the proper amount by a preponderance of the evidence. Id. § 3664(e).

16

As we explain in greater detail below, the MVRA's definition of "victim" tracks identically the definition of "victim" provided in the Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663(a)(2), the general, discretionary restitution statute that preceded and was partially superseded by the MVRA. In particular, both the MVRA and the VWPA, as amended, require identical causation standards -- i.e., the victim's harm must be "directly and proximately" caused by the defendant's criminal activity. See 18 U.S.C. § 3663A(a)(2); id. § 3663(a)(2).

Neither the VWPA nor the MVRA explicitly defines the requisite causation standard sufficiently to directly answer the question before us -- i.e, whether appellant's admitted offense "directly and proximately" caused Bayou investors' losses.

2. Legislative History

The current causation standards are the result of several amendments to the federal restitution statutes. We therefore turn to the legislative history for insight into Congressional intent. Congress first authorized federal courts to order restitution during sentencing with the enactment of the VWPA in 1982. Under the 1986 version of the VWPA, federal courts were authorized, when sentencing for certain crimes, to order "that the defendant make restitution to any victim of such offense." Hughey v. United States, 495 U.S. 411, 412 (1990). In contrast to the current versions of the MVRA and VWPA, the 1986 version of the VWPA omitted any causation standard, but, rather, simply

17

provided that restitution would apply to "any victim of the offense." See Pub. L. No. 97-291, 96 Stat. 1248 (1982).

Like the current version of the MVRA, the original version of the VWPA included a provision that limited a sentencing court's authority to order restitution where such restitution would "unduly complicate or prolong the sentencing process." See id. As the Senate Report explained, "the Committee added this provision to prevent sentencing hearings from becoming prolonged and complicated trials on the question of damages owed the victim." S. Rep. No. 97-532, at 31 (1982), reprinted in 1982 U.S.C.C.A.N. 2515, 2537.

The first major amendment to the VWPA came in 1990, with the passage of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789 (1990).[5] The Crime Control Act amended the VWPA

---

[5]Of less relevance here, a separate provision added to the VWPA with the 1990 amendments permitted courts to order restitution beyond the offense of conviction "to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). This amendment clarified an issue that had divided the circuits - - whether Hughey barred restitution beyond the count of conviction even where there was a plea agreement by the defendant. See United States v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1994); United States v. Rice, 954 F.2d 40, 43 (2d Cir. 1992).

A similar provision is included in the current version of the MVRA. 18 U.S.C. § 3663A(c)(2) ("In the case of a plea agreement that does not result in a conviction for [a covered offense], [restitution] shall apply only if the plea specifically states that [the covered offense] gave rise to the plea agreement."). Moreover, the MVRA provides that a court "shall []order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." 18 U.S.C. § 3663A(a)(3).

18

by, inter alia,[6] adding § 3663(a)(2), which provides:

> For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

See Pub. L. No. 101-647, § 2509, 104 Stat. at 4863; 18 U.S.C. § 3663(a)(2). In introducing the causation standard that the victim be "directly harmed by the defendant's criminal conduct," Congress explained:

> The use of 'directly' precludes, for example, an argument that a person has been harmed by a financial institution offense that results in a payment from the insurance fund because, as a taxpayer, a part of that person's taxes go to the insurance fund.

H.R. Rep. No. 101-681(I), at 177 n.8 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6583, n.8.

The next major amendment to the federal restitution statutes came in 1996 with enactment of the MVRA, which was included as Title II, Subtitle A, of the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Most significantly, the MVRA partially superseded the VWPA

---

[6]The Crime Control Act of 1990 was passed shortly after the Supreme Court's decision in Hughey. At issue in Hughey was whether the VWPA authorized a sentencing court to order a defendant who was charged with multiple offenses, but only convicted of a single offense, to make restitution for victims' losses related to all alleged offenses. Hughey, 495 U.S. at 412-13. The Court held that it did not, and interpreted the term "restitution to any victim of such offense" under the VWPA to authorize restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Id.

19

insofar as it made restitution that was previously discretionary mandatory as to certain offenses, see 18 U.S.C. § 3663A(a)(1) & (c), and amended the VWPA's definition of "victim" to match that of the newly enacted MVRA, including the requirement that a victim be someone "directly and proximately harmed as a result" of defendant's committed crime.  See AEDPA §§ 204, 205, 110 Stat. at 1228, 1230.

Congress explained these newly enacted causation standards as follows:

> The committee intends this provision to mean, except where a conviction is obtained by a plea bargain, that mandatory restitution provisions apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under [the convicted offense(s)].
>
> . . .
>
> In all cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution.  The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.

S. Rep. No. 104-179, at 19 (1995) reprinted in 1996 U.S.C.C.A.N. 924, 932.

To summarize, since 1982 when it authorized federal courts to impose restitution Congress has:  (i) broadened this authority by, inter alia, allowing restitution for victims who directly

20

suffered harm from crimes involving conspiracy or a criminal scheme, and allowing restitution for crimes pled in a plea agreement; (ii) made restitution mandatory for certain crimes; (iii) imposed a "direct and proximate" causation standard as to both discretionary and mandatory restitution; and (iv) remained insistent that restitution determinations not unduly prolong sentencing proceedings.

Although the legislative history is "suggestive rather than compelling" as to the requisite causation standard, United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997), it may be aptly described as a "middle road" approach. For example, Congress's intent to expand restitution as a remedial measure cautions against a rigid "direct" causation standard that would foreclose restitution where even the slightest intervening event severs factually or temporally the link between defendant's crime and victim's loss. At the same time, however, Congress's preference for expeditious restitution determinations suggests that the factual and temporal link between crime and loss cannot be so tenuous as to require a "prolonged and complicated trial[]" on the issue of causation. S. Rep. No. 97-532 at 31, supra, 1982 U.S.C.C.A.N. at 2537; see also Vaknin, 112 F.3d at 589 ("Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct. . . . Even if but for causation is acceptable in theory, limitless but for causation is not. Restitution should not lie if the conduct

21

underlying the offense of conviction is too far removed, either factually or temporally, from the loss.").

3. Caselaw

We turn next to our caselaw.[7] We have previously stated that restitution is authorized only "for losses that [were] . . . directly caused by the conduct composing the offense of conviction," United States v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1994), and only for the victim's "actual loss." United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998).

In Reifler, we addressed the MVRA's causation requirements at length and in the context of a financial fraud. There, the district court had imposed restitution orders against defendants who pled guilty to conspiracy, in violation of 18 U.S.C. § 371, to artificially inflate the price of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. Reifler, 446 F.3d at 135. We vacated the district court's restitution orders principally because they ordered restitution to persons who clearly were not victims of the conspiracy, or who were co-conspirators rather than victims. Id. at 125-26.

---

[7]Because the relevant statutory language in the MVRA and VWPA is nearly identical, we include in our analysis cases arising under both statutes. See United States v. Oladimeji, 463 F.3d 152, 158 n.1 (2d Cir. 2006)(applying Hughey, in interpretation of the VWPA, to a review of a restitution order imposed under the MVRA); In re Local # 46 Metallic Lathers Union, 568 F.3d 81, 86 (2d Cir. 2009) (same).

22

However, we also questioned whether restitution was appropriate even for the innocent persons who had made stock purchases during the conspiracy because of the difficulties in meeting the MVRA's causation requirements.  See id. at 135-39.

As we explained, the MVRA's direct and proximate causation requirements both reflect "Congress's interest in maintaining efficiency in the sentencing process."  Id. at 135.  The MVRA's direct causation requirement promotes this efficiency because "'the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation.'"  Id. at 135 (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 269 (1992)).  Likewise, the MVRA's proximate causation requirement promotes efficiency in the sentencing process by "limit[ing] a person's responsibility for the consequences of that person's own acts[,] . . . reflect[ing] ideas of what justice demands, or of what is administratively possible and convenient."  Id. at 135 (citations and internal quotation marks omitted).

Applying these principles in Reifler, we expressed serious doubt, but did not decide, whether the MVRA's causation requirements should have foreclosed restitution for even innocent shareholder victims.  See id. at 135-39.  We first noted the difficulty that the victims would have encountered as private plaintiffs in a Rule 10b-5 civil action against defendants, either for their lack of standing as purchasers or sellers of

23

securities, or for their failure to show reliance on any misrepresentation or omission by defendants, both of which are required in a private Rule 10b-5 action.  Id. at 135-36 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)).

In light of the victims' difficulty in establishing Rule 10b-5's purchaser/seller standing requirement -- a rule that is intended to avoid "severe problems of proof," Blue Chip Stamps, 421 U.S. at 758 -- we questioned whether the victims should be able to recover restitution under the MVRA, which, through its proximate causation requirement, is also intended to avoid problems of proof.  Reifler, 446 F.3d at 136.  On review of the statutory language and the legislative history, we concluded that there was nothing to suggest that "persons eligible to receive restitution under the MVRA would include persons who lack standing to sue, based on the conduct underlying the offense of conviction, in a civil action."  Id. at 137.

Reifler should not be read, however, to suggest that someone who is otherwise a "victim" is not eligible for restitution because a private right of action is not available.  Nor, if a private right of action exists, need such a person show that he or she fulfills every element of that action.  Restitution under the MVRA is a remedy provided to victims independent of the availability, or lack thereof, of a private right of action against a defendant.  What Reifler means is that where an analogous private right of action exists, caselaw under it may

24

inform, but perhaps not control, causation determinations in restitution proceedings.  In the present matter, appellant's misprison of felony concealed from authorities a massive, ongoing Ponzi scheme involving securities fraud.  Securities fraud is the subject of numerous private actions and has caused us to discuss at great lengths the causation standards applicable in that context.  See, e.g., Lentell v. Merill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); Suez Equity Inv., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95-96 (2d Cir. 2001).  In particular, we have long held that "a securities-fraud plaintiff 'must prove both transaction and loss causation.'"  Lentell, 396 F.3d at 172 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)).

We have further stated:

> Use of the term "loss causation" is occasionally confusing because it is often used to refer to three overlapping but somewhat different concepts.  It may be used to refer to whether the particular plaintiff or plaintiff class relied upon -- or is refutably presumed to have relied upon -- the misrepresentation.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d Cir. 2007).  Generally, however, courts use the term "transaction causation" to refer to this element.  See, e.g., Dura Pharms., 544 U.S. at 341-42, 125 S.Ct. 1627; Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) ("Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.").
>
> "Loss causation" may also refer to the requirement that the wrong for which the action was brought is a but-for cause or cause-in-fact of the losses suffered, also a requirement for an actionable Section 10(b) claim.

*In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509-10 (2d Cir. 2010). Finally, we have explained that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk <u>concealed</u> by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173.

4. Application

Appellant was convicted of having knowledge of, failing to report, and taking affirmative steps to conceal the Bayou fraud. See *United States v. Cefalu*, 85 F.3d 964, 969 (2d Cir. 1996) ("The elements of Misprision of Felony are 1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime.") In his view, his conduct was neither the direct nor the proximate cause, for purposes of the MVRA, of the Bayou investors' losses from early 2005 until August of that year when the fraud was revealed. He argues that, because he was not directly engaged in the operational activity of the Bayou fraud -- *e.g.*, trading, investment or other related financial activity -- his conduct in concealing the fraud was not the direct cause that the MVRA requires. We disagree.

We begin by noting that a Bayou investor may meet the causation requirement of the statutory definition of "victim" without showing individual reliance. The very nature of the

crime -- concealment -- indicates the harm deemed to result from public ignorance in the securities fraud context.  And, in any event, we may presume that had appellant disclosed the crime in a timely fashion, no investor would have invested fresh cash in the Ponzi.

For that reason, appellant cannot claim that his crime was not a cause in fact -- a "but for" cause -- of the investors' losses.  Appellant was one of four individuals who knew of and should have revealed the Bayou fraud, but did not.  During the relevant time period -- between January and August of 2005 -- investors entrusted over $60 million with Bayou in reliance on the false representation that Bayou was a legitimate investment firm that was audited by an independent financial accounting firm.  But for appellant's role in affirmatively concealing the falsity of this representation, these investors would certainly not have invested in Bayou, as no reasonable investor would invest in a known Ponzi scheme.

We find no merit in appellant's argument that the curative effect of his reporting the Bayou fraud is merely speculative.  It is true that enforcement agencies have, at times, failed to take action on the reports of so-called whistleblowers to financial fraud, see, e.g., U.S. Securities and Exchange Commission Office of Investigations, Case No. OIG-509, Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, Executive Summary, (Aug. 31, 2009), available at,

27

www.sec.gov/news/studies/2009/oig-509.pdf ("SEC Madoff Investigation"); however, it is also true that whistleblower tips are among the most effective means of revealing financial frauds and accounting scandals.  See, e.g., Douglas M. Branson, Too Many Bells? Too Many Whistles? Corporate Governance in the Post-Enron, Post-Worldcom Era, 58 S.C. L. Rev. 65, 78-79 (2006) ("Fraud and accounting imbroglios come to light because of a tip (42.6%), internal auditing (24.6%), accident (18%), outside auditors' discovery (16.4%), and . . . internal control (8.2%)."); Jonathan Macey, Getting the Word Out About Fraud: A Theoretical Analysis of Whistleblowing and Insider Trading, 105 Mich. L. Rev. 1899, 1904-06 (2007) (noting the substantial recoveries of qui tam claimants -- i.e., whistleblowers revealing fraud against the federal government by public companies -- under the Federal False Claims Act).

Where, as here, the whistleblower has insider knowledge of the ongoing fraud, the whistleblower's tip will more likely be taken seriously by enforcement officials.  See Richard E. Moberly, Sarbanes-Oxley's Structural Model to Encourage Corporate Whistleblowers, 2006 BYU L. Rev. 1107, 1107 (2006) ("[T]he [Enron, Worldcom and Global Crossing] scandals demonstrate employees' efficacy as monitors with accurate insider knowledge about the inner workings of their corporations."); Geoffrey Christopher Rapp, Beyond Protection: Invigorating Incentives for Sarbanes-Oxley Corporate and Securities Fraud Whistleblowers, 87

B.U. L. Rev. 91, 109 (2007) ("Overcoming an internal conspiracy can only succeed if insiders bring information about ongoing corporate and securities fraud to the attention of regulators . . . ."); cf. SEC Madoff Investigation at 37 ("The [SEC] Enforcement staff claimed that [a Madoff whistleblower] was not an insider or an investor, and thus, immediately discounted his evidence."). Indeed, when a Bayou investor notified authorities of the Bayou fraud, Israel and Daniel Marino were immediately taken into custody and the Bayou fraud was brought to a conclusion. Accordingly, we regard the potential curative effect of appellant's reporting of the Bayou fraud as much more than speculative.

Furthermore, appellant not only failed to disclose the fraud, but also took affirmative steps to conceal it. His conduct was, therefore, a cause in fact.

As to proximate causation,[8] appellant first argues that his actions were not substantial in comparison to the "wantonly fraudulent" conduct of the Bayou principals, Israel, Marquez and Daniel Marino. Appellant Br. 12. In addition, appellant asserts that there was nothing to suggest that he could have foreseen the extent of losses that the firm was incurring. Again we disagree.

---

[8] Appellant's actions were clearly the proximate cause of the victims' losses under the zone of risk approach to loss causation. See Lentell, 396 F.3d at 172-73. By hiding the fact that Bayou's financial audits were a sham and modifying a financial statement, appellant concealed the risk that Bayou was a Ponzi scheme. See id.

As discussed above, appellant's primary role in the Bayou fraud was in sustaining the falsity that RFA was a legitimate accounting firm that conducted independent audits of Bayou's investment results. In arguing that his conduct was not "wantonly fraudulent," appellant greatly understates his role in the Bayou fraud. In essence, he asks us to ignore the importance of independent financial auditors as vouching to the investing public for the accuracy of a firm's books and the importance of his role in vouching such accuracy to Bayou's victim investors.

Courts have long recognized the important "public watchdog" function of independent financial auditors to the investing public. As the Supreme Court has stated:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility . . . . The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. . . . Thus, the independent auditor's obligation to serve the public interest assures that the integrity of the securities markets will be preserved . . . .

United States v. Arthur Young & Co., 465 U.S. 805, 817-19 (1984); see also AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 230 (2d Cir. 2000) ("Reasonable investors surely view firms with an untrustworthy management and auditor far more negatively than they view financially identical firms with honest management and a watch-dog auditor.") (Winter, J., dissenting).

30

Here, the importance of RFA to the Bayou fraud was critical. Indeed, RFA was created precisely because Daniel Marino and Israel knew that without an independent financial auditor blessing Bayou's fictitious investment results, they would have been unable to carry out the Bayou fraud. Most important, without RFA, Bayou would have been unable to attract new investors -- the sine que non of any successful Ponzi scheme.

Moreover, there is no question that Bayou investors continuously relied on RFA's "independent audits" of Bayou's financial results. The record indicates multiple instances where investors contacted RFA with questions regarding the Bayou audits and, later, with serious concerns regarding RFA's independent status. It is also clear that appellant was keenly aware of the importance to Bayou investors of RFA's independence. At various times, appellant stressed to Daniel Marino the importance of the illusion of independence. For example, in his email to Daniel Marino regarding the Benowich letter, appellant stressed that "there is supposed to be independence between [RFA] and the both of you [Daniel Marino and Israel]." Accordingly, we are unwilling to adopt the view that appellant's actions did not seriously injure Bayou's investors. Whether they were less serious than the actions of Israel and Daniel Marino is essentially irrelevant because, during the period of appellant's criminal activity, his acts were essential to Israel and Daniel Marino's criminal scheme.

We also disagree with appellant's view that his victims' losses were not foreseeable. Through his handling of the victims' confirmation statements, appellant knew first-hand the amounts the victims had at stake in the Bayou fraud. No reasonable person in his position could have failed to foresee that the victims who invested in Bayou from January through August of 2005 would ultimately face substantial or even complete loss of their investment.

To summarize, we find no error in the district court's conclusion that appellant's failure to report the Bayou fraud was both the direct and the proximate cause of the victim investors' losses.

## CONCLUSION

For the foregoing reasons, we affirm.

32