*United States v. Goodrich*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued: January 10, 2020  Decided: September 1, 2021)

Docket No. 19-208

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

DARREN GOODRICH,

*Defendant-Appellant,*

ABRAXAS J. DISCALA, AKA AJ DISCALA, MARC WEXLER, IRA SHAPIRO,
MATTHEW BELL, CRAIG JOSEPHBERG, AKA JOBO, KYLEEN CANE, VICTOR
AZRAK, DARREN OFSINK, MICHAEL MORRIS,

*Defendants.*[*]

B e f o r e :

CALABRESI, POOLER, CARNEY, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the caption to conform with the above.

In June 2016, Defendant-Appellant Darren Goodrich pled guilty to conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. As a broker-dealer in the over-the-counter securities market, Goodrich executed fraudulent trades for a co-defendant client with the effect of artificially inflating the share price of a sham company, Cubed, Inc. ("Cubed"). While Goodrich was involved in that activity, his co-defendants arranged the sale of Cubed shares outside the public market in a private placement. The District Court (Vitaliano, *J.*) held that Goodrich was liable under the Mandatory Victims Restitution Act of 1996 ("MVRA") for restitution, both to purchasers of Cubed shares in the public market (in the amount of $479,000) and to purchasers in the private placement (in the amount of $1.85 million). Goodrich challenges the $1.85 million portion of restitution, contending that the Government did not show that the private placement losses are attributable to his offense of conviction, as the MVRA requires. We agree with Goodrich. The MVRA authorizes restitution only for losses "directly and proximately" caused by a covered "offense" of conviction. 18 U.S.C. § 3663A(a)(2), (c). This proximate cause element requires that the Government prove, by a preponderance of the evidence, that the losses for which restitution compensates were foreseeable to the defendant in the course of committing the offense of conviction. Because the Government has not adduced sufficient evidence that the private placement losses were foreseeable to Goodrich during his participation in the conspiracy to manipulate the public share price of Cubed, the MVRA does not authorize the $1.85 million in restitution for these losses.

REVERSED AND REMANDED.

────────

SHANNON C. JONES (Kevin Trowel, *on the brief*) on behalf of Jacquelyn M. Kasulis, Acting United States Attorney, United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

NATHANIEL Z. MARMUR, The Law Offices of Nathaniel Z. Marmur, PLLC, New York, NY, *for Defendant-Appellant*.

────────

2

CARNEY, *Circuit Judge*:

In June 2016, Defendant-Appellant Darren Goodrich pled guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. Goodrich was a broker-dealer in the over-the-counter ("OTC") securities market. At the direction of a co-defendant client, he executed fraudulent trades that artificially inflated the share price of a sham company, Cubed, Inc. ("Cubed"). While Goodrich was involved in that activity, his co-defendants, who are not appellants here, arranged the sale of Cubed shares outside the public market in a private placement. The District Court (Vitaliano, *J.*) determined that Goodrich was liable under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, to make restitution both to purchasers of Cubed shares in the public market ($479,000) and in the private placement ($1.85 million), totaling $2.3 million.

Goodrich challenges the $1.85 million portion of the restitution order. He argues that the losses of the private placement victims are not attributable to his offense of conviction as the MVRA requires. The MVRA provides that, to be owed restitution, a victim must have been "directly and proximately harmed as a result of the commission of [a covered] offense" of conviction. 18 U.S.C. § 3663A(a)(2), (c). Under this standard, we must identify both (i) what Goodrich's relevant "offense" of conviction is, and (ii) whether that offense "directly and proximately" caused the asserted harm to the victims. The latter proximate cause element requires the Government to show, by a preponderance of the evidence, that the harm to victims was foreseeable to Goodrich in the course of committing the offense of conviction.

We conclude that the Government has not made that showing here. The offense to which Goodrich pled guilty was conspiracy to manipulate the Cubed share price in the public market. Although in some circumstances a participant in such a scheme might reasonably foresee harm to victims who purchase shares outside the public

3

market, the Government has not adduced sufficient evidence that the private placement victims were foreseeable to Goodrich. We accordingly REVERSE the District Court's order of restitution in part and REMAND for entry of a further amended criminal judgment consistent with this Opinion.

## BACKGROUND

### I.      Factual Background

In November 2015, Goodrich was indicted along with several co-defendants for his involvement in a "pump and dump" market manipulation scheme.[1] The operative Superseding Indictment[2] charged Goodrich with: (i) conspiracy to commit securities fraud, *see* 18 U.S.C. § 371 (Count One), (ii) conspiracy to commit mail and wire fraud, *see* 18 U.S.C. § 1349 (Count Two), (iii) securities fraud, *see* 15 U.S.C. §§ 78j(b) and 78ff (Count Four), and (iv) wire fraud, *see* 18 U.S.C. § 1343 (Count Six). Ultimately, all defendants charged in the scheme except for two entered guilty pleas. Goodrich pled guilty in June 2016. Two defendants—Abraxas J. Discala, the leader of the scheme, and Kyleen Cane, a lawyer prosecuted for assisting in the scheme—were tried before a jury in April and May 2018. Discala was convicted, but Cane was acquitted.

---

[1] The Superseding Indictment explains that a "pump and dump" scheme involves "a group of individuals who control the free trading o[f] allegedly unrestricted shares" of a public company by "fraudulently inflat[ing] the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, false and misleading press releases and paid stock promotions. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain." App'x at 26.

[2] The prosecution of the conspiracy began in July 2014 when an indictment initially charged seven defendants, but not Goodrich, with the scheme. In November 2015, the Superseding Indictment added Goodrich and two others as defendants and excluded three of the original defendants who had pled guilty by that time.

4

The following narrative is drawn from the Superseding Indictment and Goodrich's Presentence Investigation Report ("PSR"), unless otherwise noted.

A.    The Cubed Scheme

Cubed was one of four public companies on which Defendants' market manipulation scheme was focused. The Superseding Indictment charged Goodrich with involvement only in the Cubed portion of the scheme and not in any conduct relating to the three other companies.

Discala led the overall scheme. He was the Chief Executive Officer of OmniView Capital Advisors LLC, a company that purported to raise capital for and provide strategic advice to companies, including the four at issue. Cubed came into existence as part of the scheme in March 2014, after a public shell company acquired the intellectual property of a private startup in a reverse merger and renamed itself "Cubed." Cubed purported to develop mobile applications, but had no operations or assets and was essentially worthless.

Through the reverse merger, Cubed became a public company. Its unrestricted shares traded under the ticker symbol CRPT in the OTC market—thus not on any stock exchange. Although the shares appeared to be freely traded, Cane secretly controlled a substantial portion of them through an escrow account.[3] Using that account, the defendants coordinated fraudulent "wash trades" and "matched trades" among themselves, with the gradual effect of increasing Cube's share price and trading

---

[3] The Government proffered evidence at trial suggesting that Cane's de facto control of the shares was concealed through the use of "nominee" shareholders—generally, sham entities or individuals who appear to own, but do not actually control, shares.

volume.[4] Ultimately, unsuspecting investors bought Cubed shares at the artificially inflated prices.

Cubed's shares traded in this fashion from approximately March 28, 2014 to July 9, 2014, when the Securities and Exchange Commission ("SEC") shut down trading following Discala and Cane's arrests. Under Defendants' influence, Cubed's share price opened at $5.00 on March 28, 2014, showed no activity for fifteen days until April 22, 2014, reached a peak closing price of $6.75 on June 23, 2014, and finally closed at $6.60 on July 9, 2014 when the SEC halted trading.

### B.    Goodrich's Role in the Cubed Scheme

Goodrich was the Managing Director and head trader at a brokerage firm in Los Angeles. As a broker-dealer, Goodrich was licensed to quote prices and to buy and sell Cubed shares in the OTC market. Goodrich joined the scheme on April 22, 2014 and continued participating in it until the SEC halted trading.

During his plea allocution, Goodrich admitted to being fully aware that the trades he executed were intended to manipulate the market. Numerous phone calls between Discala and Goodrich, recorded by the Federal Bureau of Investigation, evinced Goodrich's knowledge. On these calls, Discala directed Goodrich to make trades at particular prices. Goodrich also spoke with Discala about his discussions with Cane on how the escrow arrangement worked.

---

[4] In a "wash trade," the beneficial ownership of a stock does not change hands because the owner simultaneously buys and sells the stock at a particular price. *See* App'x at 27 (Superseding Indictment ¶ 17). A matched trade is similar to a wash trade except that the buyer and seller are different but coordinate their simultaneous sale and purchase of a stock at a particular price. *See id.* The consequence of these trades is that the defrauding parties create the appearance of demand for a stock and thereby increase the price and trading volume.

Critical to the restitution issue, the Government relies on a June 5, 2014 call between Goodrich and Discala to demonstrate that Goodrich knew about the private placement scheme through which investors bought restricted Cubed shares at $1.00 per share. The Government points to Discala's discussion of Cubed shares "at a buck" as an oblique reference to the private placement:

> GOODRICH: So I'm going to call [Cane] and tell her to get the, you know some accounts going and I'm also going to ask her, do you want, what, what exactly should I ask her on the Cube?
>
> DISCALA: No, just say, what, when, when, when should I expect my 50?
>
> GOODRICH: Okay. [ . . . ] Gotcha. What uhm, is it 50 thousand dollars or 50 cents, what, so I know, so I just know what I'm talking about.
>
> DISCALA: 25 cents, 50 thousand shares, less than I paid.
>
> GOODRICH: Got it, okay cool.
>
> DISCALA: That's a little kiss and make up and how ya like me now.
>
> GOODRICH: I appreciate it, is this Scanbuy or Cube, just to make sure I don't sound like an idiot.
>
> DISCALA: Cube.
>
> GOODRICH: Cube, got it. Ok.
>
> DISCALA: Cube. Scanbuy you're gonna get a lot more, I'm, I'm going to get you in, but I just don't know how yet, I'm not going to know what allocation I have, uhm[.]
>
> GOODRICH: Gotcha.
>
> DISCALA: For you know, and what you should say is *what do you have at a buck on CRPT*? I'd like to see the documentation, you know all that stuff, for accounting. Three things we need to talk about Kyleen [Cane], uhm what's this round going on with CRPT, the stock that uhm AJ discussed with me, uhm and uhm also, uh, documentation on investment that Marc and AJ are going to, you know, everything. Everything I talk to you, you can talk to her about.
>
> GOODRICH: Gotcha, gotcha. Okay, perfect[.]

App'x at 281-82 (emphasis added).

C.    The Private Placement of Cubed Stock

The private placement is not referred to in the Superseding Indictment, Goodrich's Pre-Sentence Investigation Report, the Plea Agreement, or plea allocution. In the case materials, the first reference to the private placement, with respect to Goodrich, is in the Government's July 9, 2018 sentencing submission, which the Government filed three days before sentencing.

The private placement, alleged to have been coordinated by Cane, offered restricted Cube stock to investors outside the public market for $1.00 per share. Evidence admitted at Discala and Cane's trial suggested that, between March 31, 2014 and June 24, 2014, investors who participated in the private placement deposited about $2.21 million into an escrow account managed by Cane. Of this amount, about $2 million was deposited after April 22, 2014, when Goodrich first joined the scheme and began trading. The Government later adjusted the total amount attributed to Goodrich for restitution purposes from the original calculation of $2 million to the $1.85 million figure now at issue.

## II.    Procedural History

A.    Goodrich's Guilty Plea

On June 9, 2016, Goodrich entered into a Plea Agreement with the Government under which he would plead guilty only to Count One, conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. He entered his guilty plea on June 27, 2016.

During the plea allocution, Goodrich admitted to the conduct supporting his guilty plea. The hearing transcript suggests that the Government reviewed the contents of the allocution statement in advance. *See* App'x at 111 (Government explaining its understanding of what would "not be covered" in the statement). In relevant part, the allocution proceeded as follows:

THE COURT: As we went over earlier in today's proceeding, you're going to have to tell me what it is that you did such that you are in fact guilty of Count 1 of the superseding indictment, which as I just mentioned charges you with a violation of 18 United States Code Section 371. So in you[r] own words, if you could tell me what you did.

THE DEFENDANT: Okay. In spring of 2014, I was a representative acting as a broker and a trader at BMA Securities. Starting in late April/early May, one of my clients asked me to place trades in the stock Cubed, Inc., which traded under the ticker symbol CRPT. From our conversations, I learned that my client was interested in having the stock price at certain levels and my execution of his orders would assist in achieving that objective. I knew that I was not supposed to assist in placing orders where the proposed trade was to influence the market.

I also learned from the conversations with my client that he was working with others in the market to cause the stock to trade at desired levels. Despite learning these facts, I agreed to continue to do business with this client[] and continued to execute buy-and-sell orders in CRPT that I knew were intended to cause CRPT to trade at artificial levels.

[ . . . ]

THE COURT: Mr. Goodrich, with regard to any overt act that you undertook with regard to the conspiracy, could you tell me about that?

THE DEFENDANT: I had various phone calls with A.J. Discala, in which he told me he liked particular levels of stock to trade, and I think that's evidenced in part M [of a document submitted to the court].

THE COURT: For the record, can you tell me what part M is?

THE DEFENDANT: Can I read it, your Honor?

THE COURT: Sure.

THE DEFENDANT: On or about May 29th, 2014, during a telephone call between Discala and Goodrich, Discala stated in part, "no, just buy 100 and stay under 43. I'll have the other guys move up."

THE COURT: Is it true that you had that discussion with Mr. Discala?

THE DEFENDANT: Yes, your Honor.

THE COURT: And that that is what was said in the call on or about May 29th, 2014?

THE DEFENDANT: Yes, your Honor.

THE COURT: For the government, is that a sufficient allocution?

MS. JONES: We believe so, your Honor.

App'x at 113-17.

B.      Sentencing and Restitution Proceedings

On July 12, 2018—two years after Goodrich's June 2016 guilty plea and a few months after Discala and Cane's trial—Goodrich was sentenced. The District Court imposed a below-Guidelines sentence of 41 months' imprisonment, one year of supervised release, and a $100 special assessment.

During the sentencing hearing, the District Court reserved decision on restitution for a later hearing, explaining that it needed additional time to resolve the parties' disagreement over the proper amount of restitution owed. As discussed, in a sentencing submission filed three days before the hearing, the Government sought restitution for the private placement losses. Goodrich objected to that request.

After further briefing and a second hearing, the District Court entered an order on December 6, 2018, imposing on Goodrich the full amount of restitution ($2,329,007.05) requested by the Government. *See United States v. Goodrich*, No. 14-cr-399, 2019 WL 112612, at *1 (E.D.N.Y. Jan. 4, 2019). This amount comprised both (i) $479,007.05 to victims who purchased unrestricted Cubed shares in the public market from April 22, 2014 onward, and (ii) the challenged $1.85 million to victims who purchased restricted Cubed shares in the private placement from April 22, 2014 onward. *Id.* at *2, *3.

In imposing the $1.85 million portion, the District Court explained that the MVRA mandates restitution for "the loss sustained by all the victims as a result of the crime of conviction." *Id.* at *2. The District Court rejected Goodrich's argument that he

10

should not owe restitution for the private placement losses because he was involved only in the public trading activity and was not aware of the private placement. The District Court found that Goodrich knew about the private placement as evidenced by the June 5, 2014 wiretapped call during which Discala directed Goodrich to ask Cane for Cubed shares "at a buck": "there would be no reason for [Goodrich] to be aware of [Cane] at all" except in connection with the private placement because her "role" was to "organiz[e] the complementary private placement of Cubed stock after the reverse merger." *Id*. The District Court further found that the wiretapped call showed that Goodrich "wanted, specifically, to acquire [Cubed shares] for himself 'at a buck'" so he must have known about the private placement. *Id*. As the District Court explained, "[t]he synergy between the public trading and private placement transactions is undeniable. Each one made the other more attractive. Goodrich was surely aware of that synergy and of its inevitable impact on both classes of victims." *Id.* at *3. The District Court acknowledged, however, that "[c]ertainly, there is no evidence to suggest that Goodrich was involved in the planning or execution of the private placement of Cubed stock," but he was "well aware" of it. *Id.* at *2.

On January 15, 2019, the District Court entered an Amended Judgment, including the full restitution order of $2.3 million. Goodrich timely appealed.

## DISCUSSION

"We review an MVRA order of restitution deferentially, and we will reverse only for abuse of discretion." *United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013).[5] An abuse of discretion occurs when "a challenged ruling rests on an error of law, a clearly

---

[5] Unless otherwise indicated, in quoting case law and the parties' briefs, we omit all internal quotation marks, alterations, emphases, footnotes, and citations.

erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006). "Where [a defendant] challenges the district court's finding of facts, we review for clear error; where his arguments raise questions of law, our review is de novo." *Gushlak*, 728 F.3d at 190–91.

## I.      The Mandatory Victims Restitution Act of 1996

The MVRA provides that "the court shall order . . . that the defendant make restitution to the victim of the offense."[6] 18 U.S.C. § 3663A(a)(1). Section (a)(2) of the statute defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. 3663A(a)(2). Thus, in determining to whom a defendant owes restitution, the statute requires the court (1) to identify the "offense" of conviction and (2) to ascertain whether the putative "victim" was "directly and proximately harmed" by the defendant's commission of that "offense."

We must turn first to identifying the nature and scope of the "offense" on which restitution is based. As we explained in *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), restitution may be imposed only for losses arising from "'the specific conduct that is the basis of the offense of conviction.'" *Vilar*, 729 F.3d at 97 (quoting *Hughey v. United States*,

---

[6] The statute mandates restitution for the offense of conspiracy to commit securities fraud to which Goodrich pled guilty, because this offense resulted in "an identifiable victim or victims [who] has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).

495 U.S. 411, 413 (1990)).[7] Where, as here, the offense of conviction is a conspiracy, we look to "the defendant's criminal conduct in the course of" that conspiracy as the basis for restitution. 18 U.S.C. § 3663A(a)(2). As we have previously ruled, this statutory language does not limit restitution to "losses caused by the actions of that defendant" during the conspiracy, but also embraces losses flowing from the reasonably foreseeable "actions of that defendant's co-conspirators." *United States v. Boyd*, 222 F.3d 47, 50–51 (2d Cir. 2000). This is because the defendant's "specific conduct" in a conspiracy includes his *agreement* to the "common plan of the conspiracy" and the "reasonably foreseeable acts of all co-conspirators" advancing that plan. *Id*. at 51.[8] *See Vilar*, 729 F.3d

---

[7] In *Hughey*, the Supreme Court interpreted a nearly identical predecessor statute to the MVRA, the Victim and Witness Protection Act of 1982 ("VWPA")). The Supreme Court focused on a provision in the VWPA functionally equivalent to § 3663A(a)(1) in the MVRA. *See* 18 U.S.C. § 3663A(a)(1) (requiring that "the defendant make restitution to the victim of the offense"); *Hughey*, 495 U.S. at 412 (interpreting the VWPA's requirement that "the defendant make restitution to any victim of such offense") (quoting 18 U.S.C. § 3579(a)(1) (1982 ed.)).

[8] As *Boyd* further clarified, imposition of a restitution obligation based on co-conspirators' acts does not require that the offense of conviction be conspiracy itself. Rather, the offense must simply be one involving conspiracy. *See Boyd*, 222 F.3d at 51. In *Boyd*, we affirmed an order of restitution incorporating losses caused by co-conspirators' acts, even though the defendant was acquitted of conspiracy and convicted only of substantive offenses. Because the defendant had not committed the substantive offenses herself, we found that her conviction necessarily rested on a theory of co-conspirator liability under *Pinkerton v. United* States, 328 U.S. 640 (1946). Thus, we held that it was appropriate for the restitution order to incorporate losses based on her co-conspirators' acts.

Relatedly, we do not read *Boyd* to be in tension with our later statement in *Vilar* that restitution must flow from "the loss caused by the specific conduct that is the basis of the offense of conviction.'" *Vilar*, 729 F.3d at 62, 97 (quoting *Hughey*, 495 U.S. at 413). In *Boyd*, we quoted a First Circuit decision approvingly that states that restitution is *not* limited to "losses attributable solely to the offense of conviction [but may include] all losses caused in the course of a defendant's criminal conduct." *See Boyd*, 222 F.3d at 50 (quoting *United States v. Collins*, 209 F.3d 1, 3 (1st Cir. 1999)). This quoted language from *Collins* may obscure the main thrust of *Boyd*: we found that conspiracy *was* part of the defendant's "offense of conviction," and

at 97; *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) ("We have frequently noted that the essence of conspiracy is the agreement and not the commission of the substantive offense."). In this way, a restitution order that incorporates a co-conspirator's acts is rooted in the defendant's own "criminal conduct." 18 U.S.C. § 3663A(a)(2).

We turn next to evaluating causation. As discussed, the MVRA requires that the "offense" of conviction "directly and proximately harmed" the victim entitled to restitution. Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively. *See Robers v. United States*, 572 U.S. 639, 645 (2014) (The MVRA "has a proximate cause requirement."); *see also United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011). Regarding cause in fact, the defendant's conduct must have been a necessary factor in bringing about the victim's harm. *See Marino*, 654 F.3d at 322 (observing that, under the "cause in fact" requirement, the Government showed that *"[b]ut for* appellant's role in affirmatively concealing [a Ponzi scheme], these investors would certainly not have invested in" the fund and suffered losses) (emphasis added). Regarding proximate cause, the Supreme Court has distilled the principle as follows: "The basic question that [such a] requirement presents is

---

therefore, losses flowing from the defendant's co-conspirators' acts *were* "attributable" to that offense and properly incorporated into the restitution order.

Nor does *Boyd* endorse the First Circuit's suggestion that *Hughey* is no longer good law. In *Collins*, the First Circuit found that the statement in *Hughey* – that restitution is "authorized . . . only for the loss caused by the specific conduct that is the basis of the offense of conviction," 495 U.S. at 413 – may no longer be valid after Congress amended the VWPA into a form similar to the MVRA today. *See Collins*, 209 F.3d at 2-3. But as we explained in *Vilar*, 729 F.3d at 97 n.36, *Hughey* was interpreting language ("victim *of the offense*," 18 U.S.C. § 3663A(a)(1)) that remains intact in both the VWPA and MVRA. The post-*Hughey* amendments examined by *Collins* – namely, the addition of a broader definition of "victim" comparable to § 3663A(a)(2) in the MVRA – does not undermine the offense-oriented nature and language of either statute. The *Hughey* principle discussed in *Vilar* therefore continues to apply.

14

whether the harm alleged has a sufficiently close connection to the conduct," which we evaluate based on whether that harm was "foreseeable" to a defendant. *See Robers*, 572 U.S. at 645. We similarly assessed the proximate cause requirement under a "foreseeab[ility]" standard in *Marino*, concluding that the record was sufficient "to suggest that [the defendant] could have foreseen the extent of losses that the [fraudulent scheme] was incurring." 654 F.3d at 323; *see also id.* at 324 ("No reasonable person in [the defendant's] position could have failed to foresee that the victims . . . would ultimately face substantial or even complete loss of their investment" as a result of the scheme.). Thus, we held that the defendant owed restitution for those losses.

## II.   Goodrich's Offense of Conviction

Under the MVRA then, we must first identify Goodrich's "offense of conviction." Where a defendant has pled guilty to an offense, we look to the materials supporting the plea—such as the allocution statement, the plea agreement, and the indictment—to ascertain the "offense of conviction" for restitution purposes. *See, e.g., United States v. Young*, 932 F.2d 1035, 1036-37 (2d Cir. 1991).[9]

---

[9] This approach finds support in the law of other Circuits. *See, e.g., United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) ("Because Elson was convicted pursuant to a guilty plea rather than by a jury, the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution."), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684 (2018); *United States v. Adams*, 363 F.3d 363, 367 (5th Cir. 2004) ("When a defendant pleads guilty to fraud, however, the scope of the underlying scheme is defined by the parties themselves. The mutual understanding reached by parties during plea negotiations is normally not detailed in the original charging document, and is more often gleaned from any superseding indictments, plea agreements, and statements made by the parties during plea and sentencing hearings."); *United States v. Akande*, 200 F.3d 136, 142 (3d Cir. 1999) ("Because the conviction here was the result of a plea bargain rather than the product of a jury verdict, we look to the plea agreement and colloquy" to determine "what was the 'offense of conviction.'").

15

In *Young*, we vacated a district court's order of restitution of $20,400 because that amount "exceeded the $5,500 obtained in the offense of conviction." 932 F.2d at 1037 (citing *Hughey*, 495 U.S. 411).[10] We held that, if the Government sought restitution on remand, then the District Court would be "limited" to imposing an order of restitution of up to $5,500. *Id.* at 1038. In reaching this result, we defined the scope of the "offense of conviction" in terms of the particulars of the offense to which the defendant pleaded guilty: "one count of impersonating a federal officer, in violation of 18 U.S.C. § 912, in connection with obtaining $5,500" from two victims. *Id.* at 1036. Although the defendant had allegedly carried out a "similar scheme" against "three other victims [from whom he] obtained $14,900," his plea did not address this scheme. *Id* at 1036-37. For that reason, we concluded that the second scheme was not part of his "offense of conviction," and therefore, the original restitution obligation of $20,400 would have to be lowered by $14,900 to $5,500 on remand.[11] The import of *Young* is not that a defendant must plead to a specific amount of restitution. Rather, it demonstrates that we will look to the record of the guilty plea proceedings to determine the nature and scope of the "offense of conviction."

Applying these principles, we conclude that Goodrich pleaded guilty to a conspiracy to manipulate the Cubed share price in the public securities market. The plea allocation and Superseding Indictment describe the scheme consistently in this

---

[10] Although we did not expressly discuss the statutory basis for restitution in *Young*, our reliance on *Hughey* – a case addressing the VWPA – suggests that the VWPA governed the restitution obligation. Since the VWPA is a nearly identical statute to the MVRA, we find *Young* instructive in the present case.

[11] Although the Government in *Young* conceded that the defendant's "offense of conviction" excluded the $14,900 obtained from the three additional victims, we independently agreed with this characterization of the offense of conviction, in view of the content of the defendant's guilty plea. *See Young*, 932 F.2d at 1036-37.

manner. As Goodrich allocuted, starting in April 2014, he helped his client Discala move the Cubed "stock price at certain levels" by "execut[ing] buy-and-sell orders" in concert "with others in the market" whom Discala also coordinated. App'x at 114. Goodrich understood that the "objective" of this activity was to illegally "influence the market" and to "cause [Cubed stock] to trade at artificial levels," yet he "agreed . . . to do business" with Discala. *Id*. Goodrich described performing an overt act in furtherance of the conspiracy: he participated in a May 29, 2014 wiretapped call in which Discala directed him to trade Cubed stock "at particular levels." *Id*. at 116. Goodrich further acknowledged that the May 29 call was one of several that he had with Discala to facilitate the market manipulation activity. *See id*.

The Superseding Indictment similarly describes that, between March 29, 2014 and July 9, 2014, Discala "controlled the fraudulent manipulation of Cubed's stock by directing the price and volume of Cubed's shares [to be] traded on the market" by his co-defendants, including Goodrich. *See id*. at 34, 36, 38. The indictment details Discala's and Goodrich's several wiretapped calls in addition to the May 29 call.

Tellingly, nowhere in Goodrich's plea hearing, the Plea Agreement, or the Superseding Indictment is there any reference to the private placement. Goodrich argues that, based on this fact alone, the District Court was not authorized to order restitution for the private placement losses. Because the plea materials excluded any reference to the private placement, Goodrich argues that that activity was not part of his "offense of conviction" on which restitution may be based. The Government counters that restitution for the private placement losses is proper because those losses were "directly and proximately" caused by the conspiracy to manipulate the public share price of Cubed to which Goodrich pleaded guilty. 18 U.S.C. § 3663A(a)(2).

Although we decide that the Government has not carried its burden in showing causation, we agree with its framing of the issue. Goodrich's argument jumps the gun.

17

While it is true that he pleaded guilty to a conspiracy to manipulate the Cubed share price rather than to execute the private placement, this fact is not conclusive of whether his "criminal conduct" was sufficiently connected to the private placement losses to mandate restitution under the MVRA. *See id.*; *Robers*, 572 U.S. at 645. The key question, as 18 U.S.C. § 3663A(a)(2) makes plain, is whether the losses suffered by the private placement victims were "directly and proximately" caused by the conspiracy to manipulate the public share price of Cubed. Until we answer that question, we cannot determine whether Goodrich owes restitution to the private placement victims.

### III.    The Government's Failure to Show Causation

We turn finally to whether the conspiracy to manipulate the public share price of Cubed "directly and proximately" caused harm to persons who purchased shares in the private placement. The Government bears the "burden of demonstrating," "by the preponderance of the evidence," "the amount of the loss sustained by a victim as a result of the offense" and "such other matters as the court deems appropriate" and "as justice requires." *See* 18 U.S.C. § 3664(e). Because the issue here is whether the challenged $1.85 million loss "amount" was "sustained . . . *as result of*" of Goodrich's offense, we think it "appropriate" that the Government bear the burden of proving causation. *See id.* (emphasis added).

The Government has not met that burden here. With respect to proximate cause, it has not adduced sufficient evidence that Goodrich's offense—agreeing to manipulate the Cubed share price in the public market—had a "sufficiently close connection to" the losses sustained by victims in the private placement. *See Robers*, 572 U.S. at 645. As discussed, we assess proximate cause based on whether losses are "foreseeable" to a defendant. The record contains too little evidence suggesting that Goodrich knew of, or

could have reasonably foreseen, that his participation in the public market scheme would result in the harm to private placement purchasers.

The only piece of evidence that the Government points to as demonstrating foreseeability is an ambiguous comment that Discala made to Goodrich on a wiretapped call. During that call, Discala instructs Goodrich to ask Cane, "[W]hat do you have at a buck on CRPT?" App'x at 282. The Government argues that, because the private placement involved the sale of Cubed stock for $1.00 per share, Discala's comment about "CRPT" shares "at a buck" is a reference to that scheme. *See* Gov't Br. at 19, 58. Consequently, the Government contends that Goodrich must have known about the private placement scheme. It further argues that we can infer Goodrich understood the connection between the private placement scheme and his market manipulation activity, because the inflated public share price (above $5.00 per share) made the private placement (at $1.00 per share) more attractive to investors.

But the evidence does not sufficiently show that this theory is more likely than not true, as the preponderance of the evidence standard requires. The conversation between Discala and Goodrich is opaque. In giving the instructions to Goodrich, Discala states that he is talking about "you know": "For you know, and what you should say is what do you have at a buck on CRPT? . . . [U]hm what's this round going on with CRPT, the stock that uhm AJ discussed with me, uhm and uhm also, uh, documentation on investment that Marc and AJ are going to, you know, everything." App'x at 282. Goodrich also repeatedly comments on his own lack of understanding of the topic under discussion: "I'm also going to ask [Cane], do you want, what, what exactly should I ask her on the Cube? . . . What uhm, is it 50 thousand dollars or 50 cents, what, so I know, so I just know what I'm talking about. . . . is this Scanbuy or Cube, just to make sure I don't sound like an idiot." *Id*. at 281-82. The conversation further suggests that Goodrich is seeking to acquire Cubed shares *for himself*. Discala instructs Goodrich

to ask Cane, "when should *I* expect *my* 50?" *Id*. at 281 (emphasis added). When Goodrich asks Discala for clarification about whether Discala is referring to shares of Cubed or the entity called Scanbuy, Discala suggests that he can only help Goodrich "get . . . in" on Cubed for the time being: "Cube. Scanbuy you're gonna get a lot more, I'm, I'm going to get you in, but I just don't know how yet, I'm not going to know what allocation I have, uhm." *Id*. at 282. As discussed below, that Goodrich appears to have been seeking Cubed shares "at a buck" for himself tends to undermine the inference that he and Discala were discussing the private placement scheme or that Goodrich fully understood the harmful nature of the $1.00 per share sale.

The broader context also undermines that the private placement losses were foreseeable to Goodrich. As the District Court found, "[T]here is no evidence to suggest that Goodrich was involved in the planning or execution of the private placement of Cubed stock." *Goodrich*, 2019 WL 112612, at *2. Goodrich's role was to trade unrestricted Cubed stock in the public market at Discala's direction. The private placement involved the sale of restricted stock to select investors as coordinated by Cane. *See* App'x at 205 (Government describing the private placement as involving the sale of "restricted CRPT stock"). Although the Government argues that both contexts involved the sale of Cubed "common stock," *see* Gov't Br. at 39-41, restricted common stock is different in kind from unrestricted common stock. The former cannot be sold in public markets generally and is subject to unique transfer restrictions. *See* 17 CFR § 230.144(a)(3) (codifying SEC Rule 144 on the sale of restricted stock). The record contains little evidence to suggest that Goodrich understood how Discala, Cane, or their associates were handling this unique set of restricted stock, or that Goodrich even knew or foresaw that a private placement was occurring. At most, there is evidence that Goodrich spoke with Cane about the "escrow account," but that account and Cane were connected with both the public trading scheme and the private placement. *See* App'x at 36-38.

The District Court applied an incorrect legal standard by omitting any analysis of whether Goodrich's offense of conviction "directly or proximately" caused the losses to the private placement victims. It also did not properly hold the Government to its burden of showing causation by a preponderance of the evidence.

Compounding these concerns, we conclude that some of the factual premises of the District Court's analysis were clearly erroneous. The District Court found that the June 5, 2014 wiretapped call between Discala and Goodrich was compelling evidence of Goodrich's knowledge of the private placement scheme because Discala had no reason to direct Goodrich to speak with Cane *except* about the private placement. But the record belies this finding. As discussed, Goodrich acknowledged that he spoke with Cane about the escrow account, which was fundamental to the public market manipulation scheme and not just to the private placement. *See* App'x at 133–34; PSR ¶ 28–29.

The District Court further concluded that, because Goodrich's call with Discala showed that Goodrich sought Cubed shares for himself "at a buck," he must have been aware of the private placement scheme. But this conclusion requires a few inferential leaps for which the record lacks evidentiary support. The District Court did not explain how Goodrich's willingness to pay for Cubed shares at the same price as defrauded victims meant that Goodrich was aware that private placement sales to outside investors were occurring. That Cane may have used the same mechanism to sell Cubed shares to Goodrich as she did to outside investors does not prove that Goodrich was aware of the sales to outside investors. Nor does the District Court explain why, even assuming that Goodrich knew of the private placement, the conversation between Discala and Goodrich necessarily establishes that Goodrich understood the harmful nature of the $1.00 per share offer. The record suggests that Goodrich knew that Cubed's shares trading above $5.00—the baseline price when Goodrich joined the

scheme—were inflated. *See* Gov't Br. at 22 (explaining that the restitution amount for public market losses was calculated based on difference between the $5.00 per share price at the time Goodrich joined the scheme and the highest price the shares reached during the period in which he traded). But this fact does not show that Goodrich understood that the $1.00 per share price was harmful or fraudulent in the absence of evidence suggesting that Goodrich knew the Cubed shares were worth even less. Of course, the record also supports the countervailing inference that Goodrich might have been willing to pay $1.00 per share for Cubed shares that he knew were worthless, because he expected to dispose of them at a profit in some manner permitted for restricted shares. Absent further evidence, the District Court's conclusion that Goodrich must have known or could have foreseen the harm to private placement victims was conclusory.

Finally, the District Court relied heavily on its intuition that Goodrich knew about both "the public trading and private placement transactions" because they had a natural "synergy" where "[e]ach one made the other attractive." *Goodrich*, 2019 WL 112612, at *3. But this point assumes rather than proves that Goodrich could have reasonably foreseen both activities. That a private placement could be made more attractive by a public market manipulation scheme does not mean a person engaged in the latter scheme expects that a fraudulent private placement is ongoing.

Although the Government raises a plausible theory that a defendant who is engaged in public market manipulation may reasonably foresee victims who purchase inflated stock outside the public market, the record here does not establish this theory as to Goodrich under the preponderance of the evidence standard. We accordingly conclude that the District Court erred in ordering restitution for the $1.85 million in private placement losses.

## CONCLUSION

The Amended Judgment is **REVERSED** to the extent that it imposes on Goodrich a restitution obligation of $1.85 million for losses to the private placement victims. We **REMAND** the case to the District Court to enter a further amended judgment consistent with this Opinion.